Morning, ladies and gentlemen. Judge Hawkins is the third member of this panel, and he's not able to be here with us in person, but he's with us by telephone. Judge Hawkins? I'm right here, Judge. Okay. Can you hear me all right? Yes. Okay. So you'll hear questions coming from over the microphone will be from Judge Hawkins. We're going to call the calendar as it is listed, and the first case on today's calendar is Disabled Rights Action Committee versus Pacific Properties. Yes, and this would be Mr.  Arm Connector.  Good morning, Your Honors. May it please the Court, my name is Richard Arm Connector. Judge Hawkins, can you hear okay? If he could speak up just a bit. Yes, Your Honor. Thank you, that's great. And I am appearing on behalf of the Appellant Disabled Rights Action Committee. I ask to reserve three minutes of my time for rebuttal arguments. That's fine, just watch the calendar. This case concerns matters of first impression regarding the private enforcement of the Fair Housing Act. First of all, it should be emphasized that this case was dismissed under Rule 12B6 of the Rules of Federal Civil Procedure, and that despite repeated requests, no leave to amend was granted. Two portions of the court's decision are at issue. The first portion regards standing. Disabled Rights submits that the most significant case regarding standing under the Fair Housing Act is the United States Supreme Court decision in Havens Realty Corporation versus Coleman, where the Supreme Court reaffirmed that the Article III minimum of injury in fact is the only requirement for standing under the Fair Housing Act, where the term any person is used in the description of the violation. In this case, standing has been asserted under three separate rationale, each of which is supported by a different particularized injury. In this circuit, the decision of Walker versus City of Lakewood clearly holds that courts do not have the authority to create and apply new standing requirements. Nevertheless, the district court has created a new standing requirement with regard to 42 U.S.C. section 3604 F2. With regard to the other basis for standing, the district court has simply ignored the allegations of the complaint, and Disabled Rights repeated requests to amend the complaint. Thus, the district court simply overlooked the complaint's allegation that Disabled Rights had diverted resources from non-litigation activities, a fact which accords standing to drag under this court's decision in Fair Housing of Marin versus Combs. The district court also completely ignored Disabled Rights standing based upon the increase in housing costs incurred by the disabled in the Las Vegas area as a result of That's a representational standing issue? It's a representational standing, yes ma'am. Okay. On what you're calling organizational standing, I must say I always thought organizational standing and representational standing were the same thing. But what you're calling organizational standing, I gather that you would concede that the complaint might need some fleshing out, but you're willing to do that? Yes, Your Honor. I've repeatedly asked the district court for that opportunity. And if you did it, you would do it in such a fashion that, or can we tell whether you would do it in such a fashion that your allegation would be something other than the cost of this lawsuit? Yes, Your Honor. The complaint was drafted at a time when Mr. Ronald Ray Smith was alive. Right. So you weren't really dependent on this and you didn't really care whether it turned out or not. So the diversion of resources wasn't the focus of the complaint. It was simple enough that Mr. Ronald Ray Smith had gone there and had encountered discrimination, and under the statute and related decisions, including the HUD memorandum, it was clear that he had standing. So I didn't focus on the complaint. I asked, even before he died, I asked for an opportunity to amend. It wasn't granted. On my motion for reconsideration, I asked for an opportunity to amend. It wasn't granted. And that motion for reconsideration was dismissed in the most, or denied in the most cursory fashion. There's another matter here besides standing, Your Honor, and that has to do with the scope of remedies. The Fair Housing Act. Well, we're not possibly up to that. How could we possibly be up to that at this point? We don't even know if we're in the case. Well, it was denied. The district court did address it in its opinion, Your Honor. He struck that part of the complaint, or what? How did he reach it? I just don't see how anybody could reach it at this point. I'm not sure exactly under what rationale he reached it, Your Honor, but he did. Well, one thing was I had pled the remedy. You're right, Your Honor. The complaint was not the best complaint. I pled the remedy as a separate complaint. The court said, well, it's just a remedy. It's not a separate cause of action. The judge was very much right there. And he said, in any event, you don't have standing here. And plus, even if you did have standing, you don't have that cause of action, or you don't have that remedy. Now, let's go back to the F2 question. I gather there also, although Smith has died, you say you could amend to say that one or more of your members are still in that situation. Yes, Your Honor. Have actually visited this place. They actually are visiting. It's still an active organization in Las Vegas with several members. And is the facility still for sale? There are both condominiums and rental units, Your Honor. There are five properties that are at issue, five developments that are at issue. Oh, I thought it were down to one because there was a consent order with respect to the rest of them. I thought it was just down to one. The consent order was entered with regard to the rest of them, but disabled rights nor Mr. Smith were parties to that. I was under the impression that this complaint only related to one of the locations. As far as I saw, five, Your Honor. I see. So with respect to F2, then, I'm assuming that you will be able to amend the complaint to have somebody else in the same position as you. Yes, Your Honor. How would you articulate not the statutory issue, but the Article III standing? How would you explain why these people have Article III standing? Well, I think that Judge Poster's discussion in Duvivity was much better than I could ever do, and that is that where Congress has made the violation of a statute a cause of action, making an injury, then the violation of that statute creates that injury. So just as in Havens, it was misrepresentation that created standing, and just as in the Balestrieri case in the Seventh Circuit where African-American testers with no interest in renting the apartments went and were quoted higher prices than white people. That case was brought by the United States, so it didn't need Article III standing. You did need F2, but you didn't need Article III standing. But the other case, the one that Poster wrote, was a case in which the individuals were the plaintiffs, right? Yes, Your Honor. In Balestrieri, Your Honor, it was United States versus Balestrieri, but there were parties in that that were individuals, and they were awarded damages of like $2,000, $2,500. There were parties to the case as opposed to complainants to the United States. I understand the F2 issue still comes up, but I'm not sure the Article III issue still comes up. But I don't know why it matters because there's the other case. Your Honor? I don't know why it matters because there's the other case. I'm forgetting. The Havens? No, no, the other Seventh Circuit case. Oh, the Dwivedi and the Balestrieri? Right, right, right. The Seventh Circuit has addressed this quite thoroughly, Your Honor. I think the Fifth Circuit should give deference and comedy to that line of reasoning. Neither, but we may be persuaded by it. Would you like to save the balance of your time for rebuttal? Yes, Your Honor, please. Okay. Good morning, Your Honor. My name is Glenn Meyer. I represent Pacific Properties and Development Corporation, the appellee in this case. And, Your Honor, I think you in your questioning to Mr. Armconecht seized on the central issue in this case, which is regardless of any question about how the Fair Housing Act is constructed, have the plaintiffs here set out an injury that is cognizable under Article III. And the fact of the matter is they haven't. It's pretty hard with this particular subsection, which unlike the preceding one speaks in terms of any person, does create standing to the limits of Article III. So the question is, what's the limits of Article III? Absolutely. And that really should be, I think, the focus of the court's inquiry as you evaluate and decide on this case. In examining the injuries that have been alleged here, they're really, in terms of the individuals, there are really two things that they've said. One is they had an individual who observed discriminatory conditions. And the other is they said that our opportunities for housing have been constrained. And what the court has to say. Which they, for some reason, don't seem to be talking about much now. But there was some material in the complaint about essentially the right of disabled people to live in an accessible community more generally. And it strikes me that, and I guess I'd like you to address this, that when you have houses being built, you have a permanent housing stock. And as I understand the statute, if you can't sue these people, the people who are building and renting it, you're not going to be able to sue down the line resales. So once the stock is created that way, that's the way it's going to be. And if people are disabled, do they have an interest simply in seeing that there is more rather than less accessible housing? Because they may visit, they may have reasons to do business with people, they may have some time they want to buy, and also because of the economic impact on them of less as opposed to more accessible housing. Well, and I think what you've talked about, Your Honor, is a great deal of ifs. They may want to do this, they may want to do that. All right, but at the point they do want to, they won't be able to sue these people, they won't be able to sue anybody else. In other words, the stock isn't going to change. Actually, Your Honor, I don't know that they would not, after resale, be able to go back and still maintain an action against the original designer. Here I run into a statute of limitations problem. Actually, Your Honor, in other litigation we've dealt with that statute of limitations and when it's triggered and when it is told, and that is, I think, a much more complicated issue than I would like it to be, representing builders. But what we have here is people who, I like to use simple analogies, and so this is my analogy. My ability to play Major League Baseball is constrained by the fact that I'm no good at it. But since about the age of eight, I've had no interest in playing Major League Baseball. So the fact that they only allow good players to play Major League Baseball has not caused me any injury because I've never had any interest in pursuing it. The plaintiffs in this case have said, we don't live in these places and we have no interest in living in these places. So if you're talking about trying to vindicate a right that you never have any interest in exercising, at least that's what you've said in the court, how can you be said to have suffered an injury? But that's not the only question, right? It's also a question of whether they might ever want to visit it. It's also a question of whether they might have an economic interest in the overall housing stock, and you can address that question. Well, as far as the economic interest in the overall housing stock. They'll have to prove it up, and that's going to be very hard, but in terms of sitting at the complaint level now. Well, I would like to address the issue of the overall economic impact on the market because in addition to having an injury, recall that Article III standing requires that that injury be traceable to the conduct of the defendant and be redressable by a remedy judged against that defendant. So when you are saying, I have an interest overall in having good available housing to disabled people in the Las Vegas community, and your attempt to try and vindicate that is by pursuing a single suit against a single builder, how is that one builder's conduct traceable to fixing the overall market as a whole, and how is a claim against that builder going to redress the issue of the market as a whole? Remember that we're not just talking about the ability of private persons to enforce these actions. That's not their only remedy. They can go to the government. They can file administrative complaints with HUD. Eventually they can pursue the case on up through the Justice Department, and as Your Honor pointed out, that was done in this case. There are other ways to address that more global and general issue of what is the overall economic impact of housing stock in the market, but nobody here has said my particular economic circumstances were adversely affected. Nobody has said I had to pay more for a condo because I wanted an accessible one. Judge Hawkins, how are these testers in this organization different from the NAACP and their testers? I would characterize the difference, Your Honor, as one of activity versus passivity. The individuals here, they go and they observe conditions, and that's much less than what the testers in cases like Havens or any of the other racial fair housing cases do. They go and they actually receive information. You'll recall one of the principal bases of finding standing for those individuals is under 3604D, which affords all people a right to not receive any misrepresented information about housing, and that's how, in Havens, the Supreme Court found standing for testers. In the Balestieri case, although, as was correctly pointed out here below, that was not a pure standing case, that also dealt at least in part with 3604D. The one case that didn't specifically rely on a violation of 3604D as a basis for tester standing was the Boivety case out of the Seventh Circuit that Judge Posner decided and, in his opinion, talked at great length, and it was cited in the appellant's brief, about sort of the nature and the history of tester standing, and he was very, I think, grudging about affording tester standing and talked about how it was in large part form over substance, and he ultimately came to the conclusion that while there was no 3604D misrepresentation in that case, you could afford 3604B standing to the testers. Unfortunately, that case really doesn't give this Court any guidance because Judge Posner never discussed what the nature of the injury to those testers was. Well, what he was saying was essentially that Congress, by saying that any person had a right to be free from discrimination, was creating an injury, was creating a statutory right. In other words, it's applied here. What he would be saying is that by saying that any person has a right to be free from discrimination on the basis of handicap or disability, they were saying, or we could understand the statute as saying that Mr. Smith, when he was alive, had a right not to go into this building and see these inaccessible conditions and that that was sufficient discrimination against him because the statute said it was. Well, and I think that that's an excellent way to characterize it, Your Honor, because what they said was he saw discriminatory conditions. Nowhere else in any of the other tester cases was anybody... I mean, it's just a different kind of discrimination. In one hand, it's inaccessibility. On the other hand, it's upping the rentals to discourage people from renting them. But those are two fundamentally different things. Well, suppose the person in the... I'm sorry. That's okay. I don't want to keep interrupting you. Suppose the person in the DeWitty case had not gotten taught, and I don't know if they did or didn't, but rather than talking to anybody about what the rentals were, had seen, you know, was handed a piece of paper, walked in and said, you know, what's the rent here? And they handed him a piece of paper. Does that matter? They were still directly provided with information. The way I would pose the issue is, suppose somebody had been watching what was going on with the Boviti testers on a hidden camera. Would that person who was watching on a camera have standing? That, I think, is what they're trying to do when they say merely driving by, literally under their interpretation, if they drove by a complex and saw a step in a sidewalk, that person then has observed a discriminatory condition and has the right to do that. I'm short on time. I would like to really briefly address the organizational standing issue, if I may. Both Spann and this Court's decision in Combs talked about what the diversion has to be in order to afford organizational standing, and I believe that both Spann and Combs talked about diversion from other activities other than litigation. I mean, isn't the problem here that they weren't allowed to amend the complaint? They say they could amend the complaint to comply with that, and we don't know, and they certainly have a right to amend the complaint, don't they? I think, Your Honor, and just to finish, in all of the information that they gave the Court in their pleadings on the motion to dismiss, in the motion for reconsideration, and indeed under Rule 12, I believe,  I cited the wrong rule, but they could have amended the complaint while the motion was pending, and they never gave the Court any concrete thing other than saying, well, we can amend the complaint to make it right. They never gave them any meat to say this is what we're going to say to make it right. My time's up, and I thank you for your time. Thank you, Counselor. Your Honor. Did you ever tell the judge what you ever proposed an amendment or tell him what you were going to amend it to add? I think I did, Your Honor. I said if there's any facts needed for standing. For example, in answering the motion to dismiss, I didn't amend. I didn't think I needed to. I thought I was well-versed enough in the law that I didn't need to amend having alleged the injuries that I alleged. And I said if there is any fact needed for standing, I'll be glad to amend. But that's, I mean, that's a little odd, because either you did or you didn't divert your attentions from something other than litigation, and you can't say, well, I'll just put something in that says I did, whether you did or didn't. I mean, there have to be some representations about what actually happened as opposed to that you can put something in whether it happened or not. Well, I was, I didn't think I needed to go that far. If they wanted to have an accounting of the diversion of the resources, I could have talked to my client and prepared it. But I was quite confident that a motion to dismiss, the allegation was sufficient. As far as the injury that Mr. Meyer doesn't see, first of all, Mr. Smith didn't just observe. He went there. He didn't see it on a camera. He went there. He encountered the discrimination, you know, the bad curb cuts and all. He saw it. The allegation that the discrimination made it difficult to actually view the house and decide whether they wanted to rent it. I mean, it strikes me that one definite injury here would be if the individuals couldn't, they certainly shouldn't have to decide whether they wanted to buy the house if they couldn't actually view the house because of. I don't think that allegation was made. But as far as looking at the Article III minima for standing, the distinction between somebody who goes and encounters discriminatory conditions. If someone's in a wheelchair and encounters, then the most egregious thing would be a step. And they can't going forward. That's, in my estimation, more of a statement of how they're not wanted than if they're quoted higher rental rates, as happened in Balestrieri. The same emotional, intangible injuries that would attend the NAACP's testers or whichever group's testers in Chicago in the Balestrieri case would attend a disabled person who similarly encountered discrimination, which totally barred their access. Well, what did Judge George say about the organizational standing? Did he ever say anything about it? I don't see it in the written. No, Your Honor. He said that it had not been shown. Accordingly, Smith, by standing, goes to Smith. Then further, Drack has not shown. That's not a motion to dismiss. Drack has not shown that it has standing separate and apart from Smith. Did he ever say anything about allowing you to amend the motion? There was no oral argument on this, Your Honor. There was never oral argument on this. Not on the motion to reconsider either? There was a motion for reconsideration. There's no argument on that? There's no argument on that, Your Honor. I see. So basically, we have nothing from the judge about why he didn't allow you to amend it. Thank you, counsel. Time's up. The matter will stand submitted. Thank you very much. Judge Baez? Yes. Do you intend to break? I'm sorry? Do you intend to break at some point? Yes, whenever you'd like. After DeMaria, perhaps? Okay. Thank you. The next case on today's calendar is Elaine Barron.
judges: Hawkins, Paez, Berzon